(No. 57963.—

*In re* ESTATE OF FLORENCE DONNELLY, a Disabled Adult (Margie Lee Tegeler *et al.*, Appellees, v. Ralph J. Mendelsohn, Appellant).

*Opinion filed October 4, 1983.*

Mundelsohn & Simmons, of Godfrey, for appellant.

Stephanie Robbins, of Earl L. Vuagniaux, of Edwardsville, P.C., for appellees.

JUSTICE GOLDENHERSH delivered the opinion of the court:

Petitioners, Margie Lee Tegeler and her mother, June Helen Smith, co-plenary guardians of the person and estate of Florence Donnelly, filed an interim report and a petition seeking, *inter alia*, compensation for providing Mrs. Donnelly "with human contact and companionship." The circuit court of Madison County held that these services were not compensable. The appellate court reversed (111 Ill. App. 3d 1035), and we allowed the guardian *ad litem's* petition for leave to appeal (87 Ill. 2d R. 315).

Petitioner Tegeler came into contact with Mrs. Donnelly while volunteering for "Meals On Wheels," a program established by the Senior Citizens Center and the churches of Collinsville to distribute meals to senior citizens in the community. Mrs. Donnelly was found unbathed, unkempt, and confused. The house in which she was living was infested with mice, filled with garbage, extremely hot, and in a state of disrepair. Petitioners began visiting Mrs. Donnelly on a daily basis to help her with her personal hygiene and dietary habits. Mrs. Donnelly appointed petitioners her attorneys in fact, and later petitioners were appointed temporary co-plenary guardians.

Petitioners attempted to locate Mrs. Donnelly's family so that she could be united with them and they could "take over." Petitioners discovered that Mrs. Donnelly had an 85-year-old half-brother who lived in Michigan. Petitioner Smith communicated with him and advised him of Mrs. Donnelly's situation.

Mrs. Donnelly's half-brother and a member of his family came to Collinsville and visited Mrs. Donnelly for approximately one hour. They met with petitioners, visited the Eden Village Care Center, the nursing home in which petitioners intended to place Mrs. Donnelly, approved of the arrangements, and signed documents which stated that they "asked that June Smith and Margie Tegeler, become full legal guardians of Florence Donnelly." They visited Mrs. Donnelly once more.

Mrs. Donnelly was placed in Eden Village. Petitioners visited her every day for the first week she was in Eden Village, and at least three times each week thereafter, bringing her food, cakes and candy, helping her change clothes, combing her hair, and making sure she brushed her teeth. Petitioners took Mrs. Donnelly on trips to Pere Marquette, St. Clair Square shopping mall, and various restaurants. For Halloween, petitioners brought over Halloween candy and a pumpkin, and carved the pumpkin at the home with Mrs. Donnelly. For Thanksgiving, petitioners brought Mrs. Donnelly to petitioner Smith's home for dinner. For Christmas, petitioners and two of their family members spent Christmas Day with Mrs. Donnelly, opening presents, taking photographs, going out to dinner, and driving around the city. At one of the hearings petitioner Tegeler stated: "She is just like a grandmother. We have actually just adopted her in our minds as part of our family, and she is part of our family." Petitioner Tegeler stated that she had spoken with one of the members of the board of directors at Eden

Village concerning putting the resident's night clothes on in the evening, and indicated that she will "become part of the Board *** to make sure that everything stays on an even keel at Eden." When petitioner Tegeler was asked concerning Mrs. Donnelly's need for visitation, she explained:

"Yes. I think so. The more we visit, the more we do with her, the more we take her out, the more we come in contact with her the better off she is. I mean, she is hooking a rug now. When she first started about four or five weeks ago, we tried to do this rug and it was hard for her to do. She couldn't get the hang of it, and now she is doing a couple rows, you know, on her own. And she couldn't do that without us going and saying okay, here, this is how you do it. And she's getting around better. She's more alert. She participates in everything that's out there. And at first, it took a while to get adjusted. They told us it takes around six months to really get adjusted. And she likes to shop. And we have fun going out shopping and stuff. And I think it's very important to her as a person. I see a lot of people in there, how they are in there. And their families don't visit them. And it's sad. It is really sad. I myself wouldn't want this to happen to me."

Approximately one month after Mrs. Donnelly was placed in Eden Village, petitioners petitioned for appointment as her co-plenary guardians.

Petitioners filed their interim report and petition seeking, *inter alia*, payment for their services. The petition stated that petitioners had spent over 444 hours in activities concerned with Mrs. Donnelly, and that "most importantly and representing the largest time consumption, petitioners have befriended Mrs. Donnelly and have provided her with human contact and concern visiting her regularly, not less than three days each week, occasionally buying her small items to brighten her life, the latest such item being

a mechanical dog which thrilled her, and also the taking of Mrs. Donnelly on occasional shopping excursions. The providing of human contact and companionship, while time consuming, is believed by petitioners to be the greatest source of support and joy to Mrs. Donnelly and it is respectfully suggested to the court that it is essential to her happiness and well being." The guardian *ad litem* filed a pleading styled "Additional Guardian Ad Litem's Answer" in which he denied the allegations of the petition and interim report and objected to paying $1,350 to each of the plenary guardians. At the hearing, petitioner Tegeler testified that Mrs. Donnelly's monthly income was approximately $1,400 and that her monthly bill at Eden Village was $1,100. She testified that Mrs. Donnelly paid approximately $20 per month in doctor bills. It was explained that at Christmas time petitioners had taken Mrs. Donnelly "to the mall to shop *** for Christmas presents for John [Mrs. Donnelly's half-brother] and herself ***." Petitioner Tegeler indicated that, while in some of the stores, Mrs. Donnelly said she wanted to get petitioner Smith a gift. A total of $1,107.75 was spent, "gifts" for petitioners totaled $435.75, and "gifts" to Mrs. Donnelly totaled $672. A ring which Mrs. Donnelly picked out for her birthday cost $266, and a gold chain, also purchased for her birthday, cost $135. The estate paid for all of these "gifts."

The circuit court, in its order, noted that according to the petition and interim report, "The Guardians have devoted most of the time for which they seek compensation to providing her with human contact and concern by visiting her regularly." Noting that the question of whether such services were compensable was one of first impression the court ruled:

"Before addressing this issue, the Court feels it most appropriate to state that the motives of the Guardians are not viewed as questionable by the Court. However,

the utmost care must be taken to protect the interests of a ward who has been found not to have the capacity to care for her own person and estate such that plenary guardians were appointed for her. Having had plenary guardians appointed for her person and estate, Florence Donnelly no longer has the capacity to contract for services not required by the legal relationship of guardian and ward regardless of whether she desires or appreciates the services. The Court must then consider the issue regardless of the good motives of the Guardians or appreciation by the ward for the companionship afforded her by them.

The Court finds that services related only to the emotional needs of the ward should not be compensable to the Guardians. The Court reaches this conclusion after evaluating the legal relationship between guardian and ward and after giving due consideration to the need for protecting a ward from possible abuse of her funds.

The ward presently resides in a nursing home. Certain activities and companionship are inherent in such an environment. Certainly, the Guardians have added to the emotional gratification of this ward and the Court hopes they will continue to do so out of the love and affection they have voiced for her. The Court finds that services related to the care of the person of Florence Donnelly that are not ordinarily provided by the nursing home staff should be compensable to the Guardians."

The court disallowed certain expenditures, set limits on certain future expenditures, awarded each guardian $1,000, less credit for any compensation already received, and found "that a proper rate of compensation for near future services by them would be $3.00 to $5.00 per hour depending on the nature of the service."

The appellate majority found that the term "services" in section 27—1 of the Probate Act of 1975 (Ill. Rev. Stat. 1981, ch. 110½, par. 27—1) was unambiguous and included services performed exclusively for the emotional needs of the disabled adult. The appellate majority agreed with peti-

tioners' position that since section 11a—17 of the Probate Act of 1975 (Ill. Rev. Stat. 1981, ch. 110½, par. 11a—17) required the personal guardian to "assist the ward in the development of maximum self-reliance and independence" and to file reports informing the court of, *inter alia,* "the current mental, physical, and social condition of the ward" and "the guardian's visits with and activities on behalf of the ward," the personal guardians should be paid for performing these duties. The appellate majority dismissed the argument that its holding would encourage self-dealing and excessive charges to the estate, reasoning that the possibility of such abuse does not require that such services should not be performed or compensated, and that since all representatives' fees are within the strict control of the court, the circuit court could effectively control such abuses. Finally, the appellate majority noted that many of the tasks performed by the personal guardian served multiple purposes, and that great administrative difficulties would result "in attempting to differentiate between noncompensable services 'performed exclusively in relation to the emotional needs of the ward' and other, compensable, services." 111 Ill. App. 3d 1035, 1038.

Petitioners add that the legislative history of the statutes being construed makes it clear that their purpose was to "broaden, intensify, and activate the interrelationship between the guardian and the ward." Emphasizing that Mrs. Donnelly's circumstances are unique, petitioners argue that because she has no relatives within 300 miles of her present residence, has ample funds to pay for these services, and has higher intellectual capacity than the average resident of Eden Village, she needs and deserves these services. Finally, petitioners assert that the circuit court overlooked "the emotional and physical wear and tear of dealing with an elderly, mentally disabled person."

The dissent argued that neither statute mentions "emo-

tional needs" and that attending to such needs does not assist "the ward in the development of maximum self-reliance and independence." The dissent argued that untrained laymen should not be able to determine how much companionship is necessary for the ward, supply those services, "assess the net effect of their work and then pay themselves therefor." (111 Ill. App. 3d 1035, 1041.) The dissent argued that allowing fees and expenses for such services "will open the estates of wards to gross abuse and waste." (111 Ill. App. 3d 1035, 1040-41.) The dissent cited the "gift exchanging" between petitioners and Mrs. Donnelly as an example of such gross abuse and waste. (111 Ill. App. 3d 1035, 1041.) The dissent conceded that companionship, meal sharing, and gift giving "would naturally work a benefit" to the ward, but argued that "[d]uring these times of fun and laughter presumably the guardians were also enjoying themselves, so arguably the ward's estate should be granted an offset for the reciprocating fun and laughter enjoyed by the guardians." 111 Ill. App. 3d 1035, 1041.

The guardian *ad litem* adds that the circuit court noted that Mrs. Donnelly does not have the capacity to decide whether she wants the companionship of petitioners. The guardian *ad litem* asserts that if petitioners have adopted Mrs. Donnelly into their family, she should not have to pay every time she is brought into the family circle.

The evidence shows that Mrs. Donnelly's estate is worth more than $90,000 and produces income estimated at $280 per month more than her monthly expenses. We find apposite here the statement found in *May v. May* (1872), 109 Mass. 252, 256-57:

"Under such circumstances, the question is not whether the proposed outlay *** is strictly judicious and expedient in an economical sense; nor whether a trustee, acting for the benefit of minors, and bound to increase the fund

in his hands by all proper means, would be justified in incurring such an expenditure; but whether it would be unreasonable and extravagant to allow such an investment from this particular estate. We do not think that when the management of the property is taken out of the ward's hands, for his own good, the law intends to deprive him of the enjoyment of his wealth, except so far as the necessity of the case absolutely requires. We see no reason why the wishes and tastes of the ward may not properly be considered in such cases, provided the expenditure is for a purpose that is unobjectionable in itself and can be afforded without material inconvenience to his financial position, especially where there is neither wife nor child whose interests can be affected unfavorably. It could not be said to be an unreasonable expenditure for a man of like fortune and circumstances not under guardianship; and we think that the fact of guardianship furnishes no sufficient ground, in the present case, for its disallowance.''

We are not aware of any reason why the circuit court would be unable to control and properly determine the compensation reasonably allowable under section 27—1. Nor do we perceive any difficulty in evaluating any offsetting benefits accruing to the guardians in determining the appropriate fee. Indeed, the circuit court's limitation on the dollar amount of gifts to be purchased by or for Mrs. Donnelly demonstrates the ability of the court to control perceived abuses.

For the reasons stated, the judgment of the appellate court is affirmed, and the cause is remanded.

*Affirmed and remanded.*